## MANZONI v. DETROIT COCA-COLA BOTTLING COMPANY.

1. SALES—CONSUMER—MANUFACTURER—NEGLIGENCE—IMPLIED WARRANTY.

Recovery for injury sustained by the consumer as ultimate purchaser of a product may be had against the manufacturer thereof either on a theory of negligence or implied warranty.

2. SAME—FOOD—IMPLIED WARRANTY—EVIDENCE.

It is not necessary to show negligence on the part of a manufacturer of an article of food intended for human consumption when recovery of damages is sought on the basis of breach of warranty that the food is wholesome and fit for human consumption.

3. SAME—FOOD—IMPLIED WARRANTY.

The implied warranty of the manufacturer of an article of food that it is wholesome and fit for human consumption is available to all who may suffer damage by reason of their use of it in legitimate channels of trade.

4. SAME—FOOD—BREACH OF IMPLIED WARRANTY—EVIDENCE—QUESTION FOR JURY.

Jury did not commit an error of law in determining that defendant bottling company had breached its implied warranty of fitness of soft drink for human consumption at time it left defendant's control, under evidence showing retailer's handling method, plaintiff's consumption of some of it and subsequent nausea, and later analysis that the bottle had a foreign substance containing "mold filaments and mold spores," defendant's explanation not satisfying the jury.

5. SAME—UNEXPLAINED PRESENCE OF DELETERIOUS SUBSTANCE—BREACH OF WARRANTY—NEGLIGENCE.

The unexplained presence of deleterious substance in bottle of

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 46 Am Jur, Sales §§ 810, 812.
[2-5] 22 Am Jur, Food §§ 103-105.
Liability of manufacturer or packer of defective food for injury to ultimate consumer who purchased from middleman. 17 ALR 689, 39 ALR 995, 63 ALR 344, 88 ALR 531, 105 ALR 1506, 111 ALR 1242, 140 ALR 200, and 142 ALR 1491.
[6] 53 Am Jur, Trial § 842.
[7] 14 Am Jur, Costs § 92.

soft drink manufactured and sold for human consumption is
evidence of negligence as well as of breach of implied warranty
that the food was fit for human consumption.

6. TRIAL—INSTRUCTIONS CONSIDERED AS A WHOLE.

Charge to jury, when considered as a whole, *held*, to have ad-
vised jurors of the law applicable to the case so as to enable
them to make an intelligent and just disposition of the con-
troverted issues.

7. COSTS—BRIEFS.

No costs are awarded appellees upon affirmance of judgment,.
where they filed no briefs.

Appeal from Wayne; Culehan (Miles N.), J.  Sub-
mitted October 5, 1960.  (Docket Nos. 23, 24, Calen-
dar Nos. 48,032, 48,033.)  Decided June 28, 1961.

Companion cases, on implied warranty, by Theresa
Manzoni and John Manzoni against the Detroit
Coca-Cola Bottling Company, a Michigan corpora-
tion, for personal injuries and medical expense re-
sulting from drinking contaminated beverage.
Verdict and judgment for plaintiffs.  Defendant ap-
peals.  Affirmed.

*Ward, Plunkett & Cooney* (*Robert E. Rutt*, of
counsel), for defendant.

SMITH, J.  The cases before us are upon implied
warranty.  One plaintiff is Theresa Manzoni.  It
is her claim that she was injured as a result of drink-
ing Coca Cola in which something foreign was pres-
ent.  The other plaintiff, her husband, claims dam-
ages for medical expenses and loss of services.  The
cases were consolidated for trial and appeal.

In the store where the Coca Cola in question was
purchased, some 4 or 5 days before it was consumed,.
it was set out on the floor, in cases stacked one on
top of another, in fact, all over the place.  A case
was taken home by Mr. Manzoni and kept in a heated.
basement.

On the evening in question, after supper, Mrs. Manzoni took a bottle from the case, brought it upstairs, opened it in the kitchen, gave a little to her 5-year-old daughter (who experienced no ill effects) and consumed the balance herself, in front of the television. As she drank it, "it didn't taste right" but she finished it anyway. "After it was gone," she continued, "I set the thing on the table. I didn't feel so good, so I went into the bathroom, and then I came out, and there was the coke setting on the table; it had that sticky thing stuck to the bottle, all brown and dirty, * * * slimy looking like shreds of tobacco." That, she says, is when she took sick (nausea and vomiting). She called her doctor, and the following day the bottle was turned over to a representative of the Detroit board of health for examination. Analysis disclosed the foreign substance: "mold filaments and mold spores."

At the trial, to a jury, it was shown that the wife had "a nervous stomach" which, apparently, has not been quieted by this experience. The defendant, in turn, introduced evidence of its care in manufacture, and, in addition, that molds require oxygen for growth and that a bottle of Coca Cola contains carbon dioxide rather than oxygen. In addition, evidence was introduced challenging, in effect, that Mrs. Manzoni's illness, or at least its persistence, was attributable to the foreign substance at all. It would serve no useful purpose to describe the whole spectrum of the evidence, pro and con. The jury heard it and brought in verdicts of $650 for the wife and $350 for the husband. The cases are before us on a general appeal.

Defendant urges 2 general arguments. The first has to do with the form of action. It runs something like this: Plaintiffs sued upon an implied warranty; there is "no distinction between a count in implied warranty or in tort;" therefore "the burden was

upon the plaintiffs to show negligence," and since they allegedly did not, they must fail.

The fallacy in what is urged is the assertion that there is no distinction between counts in warranty and in tort. Their similarity in the present context lies only in the fact that each is a remedy aimed at the liability of the manufacturer and that each may be grounded upon the presence of a deleterious or harmful substance (*e. g.*, mouse, fly, snake, mold, animal or human organs, or residue) in an article intended for human consumption. At this point, however, similarities end and distinctions take over. The warranty action, of ancient lineage, did not require a showing of negligence[1] (though a showing of negligence, of course, did not defeat it) but it did require privity of contract. The negligence action, on the other hand, did not require privity but it did require that the plaintiff show a lack of due care with respect to the particular article, *e.g.*, the bottle of Coca Cola in the present case. Either of these doctrines, literally applied, gave the manufacturer a virtual immunity. As for privity, the injured consumer and the manufacturer were contractual strangers, unless related by a fiction. As for negligence, the annual output of such bottles often ran into the millions.[2] To show the negligence of the manufacturer with respect to any particular bottle was an impossibility.

Yet there was a problem here that required solution within the framework of modern commercial realities. At an earlier day, the day, in fact, when many of our precedents began to take form, commerce, as Llewellyn[3] puts it, was "only one step removed from barter." Sales were little more than

---

[1] See *Kenower* v. *Hotels Statler Co.* (CCA 6), 124 F2d 658.

[2] "During the year  *  *  *  [defendant's] plant bottled 14,000,000 bottles of Coca-Cola." *Norfolk Coca-Cola Bottling Works, Inc.*, v. *Krausse*, 162 Va 107, 112 (173 SE 497).

[3] Llewellyn, Cases and Materials on Sales, p 204.

neighborhood trades. The "manufactured" article was a product of the local arts. It was made under the very eyes of the person who ultimately used it. That day is long over but the precedents linger. We need not trace the industrial development, the rise of the factor, the employment of agents and sellers far removed, the commercial necessity that the consumer's reliance be placed upon the product's name, or that of its maker, rather than upon his own inspection.

Today we have no barter, no simple village shop, no personal knowledge of the maker, of the source of his materials or of his methods of manufacture. Rather, rudely intruding upon the ancient precedents "like a belligerent wife crashing in on an assignation with a hussy,"[4] we have the facts of modern trade and commerce, centralized manufacturing operations in strategic areas complemented by regional or nationwide distribution networks, accompanied by advertising and assurances of quality directly aimed at the ultimate consumers.

The result of the operation of these forces has been a marked change in legal theory on a wide front. The food and beverage area is but a small subdivision of a field much more comprehensive, involving the whole topic of products liability.[5] It ranges through areas both of contract and tort, from the liability of the manufacturer of a defective automobile wheel,[6] or cinder blocks[7] to that of the seller of an inflammable dress,[8] or the distributor of unwhole-

---

[4] *Moog Industries, Inc.*, CCH, Trade Reg Rep (10th ed) Complaints and Orders Transfer Binder 1954–1955, paragraph 25,444 (dissenting opinion).

[5] See Wilson, Products Liability, 43 Cal L Rev 614, 809.

[6] *MacPherson* v. *Buick Motor Co.*, 217 NY 382 (111 NE 1050, LRA 1916F, 696, Ann Cas 1916C, 440, 13 NCCA 1029).

[7] *Spence* v. *Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich 120.

[8] *Noone* v. *Fred Perlberg, Inc.*, 268 App Div 149 (49 NYS2d 460), aff'd mem 294 NY 680 (60 NE2d 839).

some food[9] or contaminated drink,[10] or even the purveyor of a caustic perfume.[11]

The supreme court of New Jersey has recently given this modern development exhaustive examination, concluding as follows:[12]

"The limitations of privity in contracts for the sale of goods developed their place in the law when marketing conditions were simple, when maker and buyer frequently met face to face on an equal bargaining plane and when many of the products were relatively uncomplicated and conducive to inspection by a buyer competent to evaluate their equality. See, Freezer, 'Manufacturer's Liability for Injuries Caused by His Products,' 37 Mich L Rev 1 (1938). With the advent of mass marketing, the manufacturer became remote from the purchaser, sales were accomplished through intermediaries, and the demand for the product was created by advertising media. In such an economy it became obvious that the consumer was the person being cultivated. Manifestly, the connotation of 'consumer' was broader than that of 'buyer.' He signified such a person who, in the reasonable contemplation of the parties to the sale, might be expected to use the product. Thus, where the commodities sold are such that if defectively manufactured they will be dangerous to life or limb, then society's interests can only be protected by eliminating the requirement of privity between the maker and his dealers and the reasonably expected ultimate consumer. In that way the burden of losses consequent upon use of defective articles is borne by those who are in a position to either control the danger or make an equitable distribution of the losses when they do occur."

---

[9] *Jacob E. Decker & Sons, Inc.,* v. *Capps,* 139 Tex 609 (164 SW2d 828, 142 ALR 1479).

[10] *Sharp* v. *Pittsburg Coca Cola Bottling Co.,* 180 Kan 845 (308 P2d 150).

[11] *Carter* v. *Yardley & Co. Ltd.,* 319 Mass 92 (64 NE2d 693, 164 ALR 559).

[12] *Henningsen* v. *Bloomfield Motors, Inc.,* 32 NJ 358, 379 (161 A2d 69, 80, 81).

Thus the older and narrower doctrines have given way in response to the "ever-growing pressure for protection of the consumer, coupled with a realization that liability would not unduly inhibit the enterprise of manufacturers and that they were well placed both to profit from its lessons and to distribute its burdens."[13] As a result the requirement of privity has been abandoned outright in many jurisdictions rather than by the use of fictions,[14] thereby opening the door to the widespread use of the warranty theory.

In this State we permit recovery in this type of case "either on a theory of negligence or implied warranty."[15] We have given the consumer, for reasons hereinabove set forth, this choice of remedies. We are not persuaded that we should now retract, and narrow his choice by holding that there is no difference between the two and thus he must prove negligence in every case. We are not ruling that no negligence was proved. We are holding that in a suit upon a warranty theory it is not necessary to show negligence, but rather breach of the implied warranty that the food is wholesome and fit for human consumption, and that "such warranty is available to all who may suffer damage by reason of their use in the legitimate channels of trade."[16]

But, whether the theory employed is that of warranty or negligence, it must be shown, in an action against the manufacturer, that the offensive condition was present when the product left the defend-

---

[13] 2 Harper and James, Torts, § 28.1, at 1535. See, also, Professor (now Mr. Justice) William O. Douglas, Vicarious Liability and Administration of Risk, 38 Yale LJ 584, 720.

[14] *E.g.*, The consumer is a third-party beneficiary of the manufacturer-dealer contract, or, the dealer's cause of action is "assigned" to the consumer, et cetera.

[15] *Spence* v. *Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich 120, 135.

[16] *LaHue* v. *Coca Cola Bottling, Inc.*, 50 Wash2d 645, 647 (314 P2d 421). See, also, 77 ALR2d 7, 215, 241.

ant's control. This, however, does not impose an impossible burden on the plaintiff. Rather he is aided by the doctrine most clearly enunciated by Mr. Justice WIEST many years ago when, speaking for a unanimous Court on the showing to be made in a food poisoning case,[17] said, "The poisoned flour speaks for itself; unexplained it evidences negligence, for no proof of negligence could be more direct than the flour with arsenate of lead in it." It speaks with equal clarity when the action is brought on a theory of warranty. Unexplained it evidences such breach, as well as negligence. Here the jury was not satisfied with the explanation tendered, and we are not persuaded there was error of law in their determination.

Finally, defendant complains of many errors in the charge given, particularly that a careful distinction was not observed throughout between cause of action based upon negligence and upon warranty, that the jury was not charged as to contributory negligence, that the jury was not instructed to the effect that defendant would no longer be responsible when it relinquished control of the bottle to the retailer, that the statement of the doctrine of implied warranty was tantamount to directing a verdict for plaintiffs, that no charge was given *re* proximate cause, and that plaintiffs' burden was to show that the foreign substance was in the bottle when it left the manufacturer.

Much of this is utterly inconsistent with an action based on a warranty theory. It was plaintiffs' theory of their cause of action that a manufacturer who prepares "foodstuffs destined to be sold to and consumed by the public is bound by an implied warranty that its product is free from foreign, poisonous or deleterious substances," *Cheli* v. *Cudahy Brothers*

---

[17] *Hertzler* v. *Manshum*, 228 Mich 416, 421. See, also, *Pattinson* v. *Coca-Cola Bottling Company of Port Huron*, 333 Mich 253.

*Co.,* 267 Mich 690, 696, and they were entitled to go to the jury on it.   As to the balance we are not impressed that the charge taken as a whole failed to advise "the jurors of the law applicable to the case in such a manner as [to enable] them to make an intelligent and just disposition of the controverted issues."[18]   The topic is discussed in *Gilson* v. *Bronkhorst,* 353 Mich 148.

Affirmed.   Appellees having submitted no briefs will not be awarded costs.

BLACK, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred with SMITH, J.

CARR, J. (*concurring in affirmance*).   We are concerned in these cases with a product manufactured and sold for human consumption.   The principles applicable to the disposition thereof were considered and declared at some length in *Hertzler* v. *Manshum,* 228 Mich 416, the scope of the opinion being expressly limited to facts of the character there involved. In accordance with the decision, which has been recognized as declaring the law of this State, the manufacturer of a product intended for human consumption owes a duty to the ultimate consumer and impliedly warrants that the article as manufactured is free from any content inimical to human life or health.

In the instant cases it is apparent from the record before us that the plaintiffs relied on the case cited. The pretrial statement so indicates.   The cases were tried on the theory of the implied warranty recognized in *Hertzler* v. *Manshum,* and the trial judge submitted the cases to the jury accordingly.   It is apparent that the jury determined from the proofs that plaintiffs had established prima facie cases and that defendant had failed to meet the burden resting

---

[18] *Eger* v. *Helmar,* 272 Mich 513, 517.

on it. It may not be said that such conclusions were not supported by the record. We are not concerned here with the existence or nonexistence of implied warranties in cases involving the manufacture and sale of products not intended for human consumption.

We find no reversible error and the judgments entered on the verdicts of the jury are affirmed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.